## Tim A. SHEA *v.* Pat M. RILEY, Sr.

CA 97–496                                          954 S.W.2d 951

Court of Appeals of Arkansas
Division IV
Opinion delivered November 19, 1997
[Petition for rehearing denied December 17, 1997.]

*Wright, Lindsey & Jennings*, by: *Alston Jennings*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by:

*Byron Freeland*, for appellee.

TERRY CRABTREE, Judge. Appellee, Pat M. Riley, Sr., purchased three lots near the Country Club of Little Rock from the estate of M.L. Dick for $660,000. Initially, Riley planned to have the lots re-platted into one lot and construct a new home on the site. In the course of his planning, Riley approached the neighbors on either side of the purchase and suggested selling

some of the frontage to each, thereby reducing the size of his consolidated lot and increasing the size of both neighbors' lots. Appellant, Tim A. Shea, is one of the adjacent property owners.

Appellant Shea and appellee Riley engaged in oral discussions about the sale from appellee to appellant of a twenty-foot strip of land along their common boundary. The conversations were memorialized in a series of correspondence that was introduced at trial and is the primary evidence in the case.

The first letter from Riley to Shea, dated September 29, 1995, informs Shea of Riley's purchase of the property, and states:

> We are selling 20 ft. to Tim Shea on the North to be added to his property and 20 ft. on the South to Scott Bellingrath to be added to his property . . . . [W]e will have to go back through the city and have it re-platted. At that point, we will probably ask for a waiver on the rear property set back which has been granted often in this neighborhood.

The September 29th letter also included a market analysis of Riley's current home in the area.

The second letter is addressed to both adjacent neighbors, "Scott and Tim," and dated November 20, 1995. This letter begins by saying that the re-platting must be done before the parties can "effectively conclude our transaction." Riley again mentioned the waivers he would seek from the city.

A third letter from Riley to Shea, dated November 22, 1995, informed Shea of Riley's plans for a house on the site and again mentioned the necessity for a waiver on the set-back line. No mention of the sale is present in this correspondence, although appellant's counsel suggested during oral argument that an attached site plan for the proposed house seems to illustrate the twenty-foot transfer to Shea by a line 20 feet inward from Shea's existing property line.

The fourth correspondence is a handwritten note from Shea to Riley dated November 28, 1995. In its entirety, it states:

> Thanks for sending me the tentative layout of your house. Pat before I can consider any waivers or setbacks on this project you must sell me the 20 feet of Mrs. M.L. Dick's property adjoining

mine at your suggested price of $244 per front foot on Beech-wood or give me assurance in writing that this transaction will take place.

Two days later Riley responded to Shea correcting the proposed price, which was $4,400 per foot instead of $244, and holding firm on the issue of waivers in stating:

> The price cleared up, be assured Tim that you will know I'll be committed on the sale at the time that you go along with our submission to the City. The only waiver you would look at is that we will be a little closer to the back line than is normal . . . .

The next correspondence in the record is dated December 3, 1995, from Shea to Riley. In his letter, Shea agreed that he had been mistaken on the proposed price. He stated further, "However, no mention was ever made of waivers and I can't look kindly to the sale of this aforementioned property being held hostage to my position on any so called waivers."

A final letter, dated February 5, 1996, from Riley to Shea summarized the facts from Riley's perspective as follows:

> As you know, we have held discussions reference the potential of my selling you some of the vacant lot I own next door to you on Beechwood.
>
> I sought to make you an offer, under certain conditions, whereby we could reach agreement.
>
> After this occurred, I met with you in your home on the morning of December 15, 1995.
>
> At this time you bluntly stated you would not agree with any of the conditions. In fact, you stated you wanted to place other unreasonable restrictions on plans I was developing to develop the property.
>
> It is clear you rejected my offer. It was therefore then and is now, withdrawn.

Two days later, on February 7, 1996, appellant sued, claiming the initial correspondence amounted to a contract for the sale of the twenty feet and requested specific performance. The trial court dismissed the complaint, holding that it failed to satisfy the statute of frauds and stating that the parties never achieved a meet-

ing of the minds. For his appeal, appellant urges this court to reverse the trial court and find that the series of letters includes all the necessary terms to satisfy the statute of frauds and bind the seller. However, we need not reach the issue due to our holding that the parties never manifested the objective indicators of mutual agreement necessary to form a contract.

In a chancery case, the standard of review is *de novo*, and we will not reverse unless the decision is clearly against the preponderance of the evidence. *Belue v. Belue*, 38 Ark. App. 81, 828 S.W.2d 855 (1992).

Appellee quotes the trial court's remarks at the conclusion of the hearing: "There was not a meeting of the minds as to all critical terms of the contract." Appellee uses this language to argue that the parties never reached the agreement necessary to constitute a binding contract. From the evidence adduced at the hearing, we agree with the substance of the chancellor's finding but not his choice of metaphor, and therefore affirm.

"Meeting of the minds" is described as "objective manifestations of mutual assent for the formation of a contract." *Thurman v. Thurman*, 50 Ark. App. 93, 97, 900 S.W.2d 221, 223 (1995) (*citing Dziga v. Muradian Business Brokers, Inc.*, 28 Ark. App. 241, 773 S.W.2d 106 (1989)).

The phrase "meeting of the minds" is disfavored:

> As Professor Farnsworth points out, "Discussions of this topic would be improved if this much abused metaphor ['meeting of the minds'] were abandoned. (Citation omitted). Although this Court used the metaphor as late as last year, we were careful to point out that we meant, in more modern terminology, "objective indicator[s] of agreement." *Fort Smith Service Fin. Corp. v. Parrish*, 302 Ark. 299, 789 S.W.2d 723 (1990).

*Crain Industries, Inc. v. Cass*, 305 Ark. 566, 576, 810 S.W.2d 910, 916 (1991). However, the evidence, in the form of appellant's testimony as to his understanding of the agreement and appellee's language in his correspondence, supports the trial court's finding that the alleged transaction lacked the requisite objective indicators of agreement. In each of his five letters, appellee mentioned steps

that must be taken before the sale could be consummated, including the re-platting of the lots and the approval of set-back waivers. At oral argument appellant contended that such conditions were solely under the control of appellee and that he should not escape his contractual obligation because of his failure to follow through on the zoning issues. However, this analysis assumes a contract existed where none did. Absent agreement on these conditions, appellee did not intend to be bound by his ongoing negotiations with appellant, and therefore no contract between the parties ever existed.

Our *de novo* review reveals that the trial court's finding was not clearly against the preponderance of the evidence; therefore, we affirm.

AREY and ROAF, JJ., agree.